CARL J. ECKRICH, Appellant, v. HOGAN BROTHERS, Appellees.

No. 43098.

NOVEMBER 12, 1935.

W. F. Murphy, for appellant.

Messer & Nolan, for appellees.

HAMILTON, J.—The defendant Hogan Brothers on August 28, 1933, was a partnership, located at Iowa City, Iowa, engaged in the business of selling automobiles. On the above date the plaintiff, who was then a minor of the age of twenty years—he having reached his majority on the 17th day of June, 1934—was the owner of a Ford V8 roadster, which he had purchased in January, 1933, and driven about 7,000 miles. After negotiations with the defendants at their place of business in Iowa City, a tentative agreement was reached, by which the plaintiff was to trade his Ford car and give a note and conditional sale contract for the sum of $300, $30 to be paid in October, $30 in November, and the balance in one year, in exchange for a Rockne car. Before closing the deal, plaintiff asked that he be allowed to take the car home to show the same to his father and mother. He returned and said it was all right and signed up the note and conditional sale contract and took away the Rockne car, which he was to receive in exchange at a valuation of $650. The regular price of the Rockne car was $715, but it had been used some as a demonstrator and was traded in at $650. Nothing was paid upon the note except the sum of $10. At the time the trade was made there was still due from the plaintiff on the Ford car to the Ford dealer a small balance which Hogan Brothers paid, and which was afterwards repaid to them by the mother of the plaintiff.

A few days later—plaintiff giving the time as two or three days, and defendants as three weeks—the plaintiff, accompanied

by his mother, returned the Rockne car to the defendants' garage and left it with the employees, with the request that Hogan Brothers return the Ford car, Mrs. Eckrich leaving word at the garage for Mr. Hogan to come and see her, that Carl could not pay for the car, and he would have to give up the deal. That same day, or the following day—there is a dispute in the record—Mr. E. P. Hogan, who made the deal originally, drove to the country home of the plaintiff. He found Carl and his father working on a building and the mother in the house. He talked to Carl and the father first, and the father said he didn't know anything about the deal at all; that Hogan would have to talk to the mother. Hogan asked Mrs. Eckrich what the trouble was, and she told him that she didn't think Carl was able to pay for the car; that he should not have bought it. Hogan assured her that they would not have anything to worry about; that he would not crowd Carl on his payments. Mrs. Eckrich further said that Carl was not of age. Hogan said that that was the first information he had that Carl was not of age; that he asked Carl whether he was of age at the time the deal was made, and Carl told him that he was. He said to Mrs. Eckrich, ''Carl told me he was of age,'' and turning to Carl he said, ''Carl, didn't you tell me you was of age?'' and Carl admitted that he did ''and hung his head very shamefully.'' Carl and Mrs. Eckrich have a little different version of this conversation. Mrs. Eckrich says that Hogan said he would make some trouble. ''He said if we didn't make the deal he would make us trouble because Carl wasn't of age. He didn't say there that day that Carl told him he was of age. * * * The conversation occurred out in the yard. (Mr. Hogan) didn't say that Carl told him he was of age at the time he made the deal for the car. I didn't hear Carl say yes I told Mr. Hogan that. I didn't hear him say that.'' Carl's version is at variance with his mother's: ''Mr. Hogan, when my mother and I told him I was not of age, said he would make some trouble for me because I had told him I was of age and I hadn't. He told me he would make some trouble for me if I took the Ford car back because he said I told him I was of age and I hadn't. I told him I hadn't told him I was of age. That was stated in the presence of my mother. When I told him I was not of age he didn't say very much that I remember of. He said he would give me plenty of time to pay for the car but there was

no danger of them taking the car away from me. He took me aside outside of the hearing of my mother and told me I had better go through with the contract. That my mother would get over her mad spell in a few days and would help me pay for the car. After that conversation I went back and got the Rockne car and kept it until May 10th or 12th, 1934. Hogan Bros. came and got it. * * * I heard Mr. Hogan say in the presence of my mother and my presence that I told him I was of age when he was out to our place. I remember him making the statement.''

At Christmas time, 1933, the plaintiff drove the Rockne car on a trip to Kansas, and on the way back had an accident, ran into the back end of a truck, damaged the front end of his car. On that trip he had difficulty with his pistons sticking, and when he returned home he drove into the Hogan garage and told them about it and wanted them to take care of the trouble. Hogan told him he would take the car down, and if it showed it was the car's fault that he would take care of it for him; otherwise he should pay for it. Plaintiff was not satisfied with this arrangement and wrote to the factory about the trouble, and they informed him that it was impossible to stick pistons after you have traveled six or seven thousand miles if they had plenty of oil, unless something happened; water or something got into the cylinder. The car was never repaired. Plaintiff put it in storage the first of January, 1934, and never used it afterwards, and in May, 1934, Hogan Brothers repossessed the car under their conditional sale contract. When they tore it down they found that the block had been cracked on the inside of one of the valve chambers and water was getting into the cylinder, diluting the oil and causing the pistons to stick. There is some conflict in the evidence as to what was the probable cause of this crack. The defendants' testimony is all to the effect that nothing except freezing could cause the block to crack on this particular make of car, while there was evidence on the part of the plaintiff to the contrary; the witness for the plaintiff claiming that in view of the fact that the radiator was not injured by freezing, it would indicate that the block was not injured by freezing. In response to this in rebuttal, the testimony of the defendants is to the effect that because of the peculiar construction of the radiator, it would expand before cracking, and that the block would freeze up

and crack before the radiator would. ''For that reason they put in soft plugs in the block two on the side and one on the end, and about 50% of the time that plug will blow out, leaving room for expansion so freezing won't break the block, but you can't always depend on that. We have a car now that froze, block is cracked, and radiator is O. K. Same type of radiator as Rockne. In this type the block will freeze more readily than the radiator.''

After repossessing the car, the defendants repaired the same at an expense of at least $175. There was also a repair bill upon the Ford in the neighborhood of $10. The Ford car was disposed of at a price of $350. The Rockne car was disposed of at a price of $495, after it had been repaired. It is strenuously argued by the appellant that the result of the decision of the trial court is to enrich the defendants. The difference between $650, the price of the Rockne car at the time of the trade, and the selling price of $495 after it was repaired, is $155, and the repair bill is $175, making $330, which equals the loss sustained on the Rockne car. The Ford car was sold for $350 after expending for repairs a fraction over $10, which would leave $340 to offset against the loss of $330, a difference in favor of defendants of approximately $10. It is the contention of appellant that the defendants still have possession of the $300 note upon which there is still due $290. Under the terms of the conditional sale contract, when a car is repossessed and sold, the proceeds are applied upon the principal, interest, and expenses of the sale, which in this instance would wipe out this note entirely.

The law with reference to disaffirmance of contracts by minors is found in chapter 472 of the Code of 1931 (sections 10492-10495). Section 10493 provides:

''A minor is bound not only by contracts for necessaries, but also by his other contracts, unless he disaffirms them within a reasonable time after he attains his majority, and restores to the other party all money or property received by him by virtue of the contract, and remaining within his control at any time after his attaining his majority, except as otherwise provided.''

Section 10494 provides:

''No contract can be thus disaffirmed in cases where, on

account of the minor's own misrepresentations as to his majority, or from his having engaged in business as an adult, the other party had good reason to believe him capable of contracting.''

■■■ The disaffirmance here came fifty-two days after the plaintiff attained his majority, and under all the facts and circumstances in this case, and in the light of our prior holdings, we are not prepared to say that this is not a timely disaffirmance.

■■■ On the question of misrepresentation as to his age, the court is satisfied that the preponderance or greater weight of evidence is with the defendants on this issue, and that the court was warranted in finding for the defendants and dismissing plaintiff's petition and taxing the costs to the plaintiff. The testimony of Mr. E. P. Hogan to the effect that the young man represented to him that he was of age at the time he purchased the car is direct and positive, and we can discover no inherent weaknesses, inconsistencies, or incongruities in the story which he tells. He is supported on this issue by two of his employees. The court is not favorably impressed by the testimony of Agnes M. Reese, sister of the plaintiff, who was at the time and had been for many years employed by the attorney for appellant as stenographer and secretary, in regard to her eavesdropping at the suggestion of appellant's attorney to a conversation in the office of said attorney with Mr. Hogan, in an effort to impeach Hogan's testimony, by showing inconsistent statements.

Likewise, we think the most favorable construction possible to be placed upon the testimony of Mr. and Mrs. Eckrich and the plaintiff, in reference to the conversation which took place at the farm with reference to the question of what Carl had said to Hogan about his age, fails utterly to overcome the positive testimony of Mr. Hogan and his employees. There is such a wide variance between the statement of the mother and the son on this point that it greatly weakens the force of their testimony on this subject.

This was not the first car the plaintiff had owned. He and his brother first owned in partnership a Model T Ford, purchased by their ''folks.'' This was traded for a 1915 Studebaker. They next owned a Model A Ford, which was traded for the Ford V8 involved in this exchange for the Rockne. It

seems the father had put the son on his own so far as the automobile business was concerned, for he did not run after Hogan Brothers to get the car back, and told Hogan he knew nothing about it; that he would have to see the mother. The mother finally let the boy have his way about it and go back for the Rockne after she and the son had returned it.

There probably would never have been any trouble about this deal if the crack in the cylinder valve chamber had not shown up. That this was caused by freezing is, we think, supported by the clear preponderance of the evidence. It was in the possession of plaintiff from August, 1933, until May, 1934, and he continued to run it until after the trip to Kansas at Christmas time, 1933. Something happened to cause him to quit using it. He put it in storage, never took out a license for 1934. Hogan offered to do what was fair—take down the engine, and if it was the fault of the car, fix it for nothing. Plaintiff must have had some secret knowledge as to what was wrong, for he did not accept the defendants' offer. It may be possible, as suggested by appellant's counsel, that the defendants "ganged" on this boy and traded him a car with a cracked cylinder valve chamber. If so, there is nothing in the record before us from which we can so find. The lower court had all these witnesses before him and could observe their appearance and conduct while on the witness stand, and was therefore in a much more favorable position to judge as to their credibility than is this court. We are aware, as suggested by counsel for appellant, that "the law deals gently with infants," and will as far as possible prevent fraud and overreaching, and in a proper case this court would not hesitate to apply all the safeguards which the law or equity raise up in protection of the helpless and incompetent. Here we have a young man who only lacked a few months of attaining his majority, who apparently had been given considerable rein in buying and exchanging cars for his own use, who, according to the testimony of Mr. Hogan and two employees, told Hogan he was of age. This he denies, but the evidence of three witnesses no more interested than himself, certainly outweighs his denial. This misrepresentation as to his age, made by one who had all the appearance of an adult, under the plain provisions of the statute bars him from exercising the right of disaffirmance of his contract.

We find no error in the record, and the case must be, and is, affirmed.—Affirmed.

KINTZINGER, C. J., and all Justices concur.